[Cite as *State v. Long*, 2026-Ohio-1336.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

JEREMY LONG,

    DEFENDANT-APPELLANT.

CASE NO. 3-25-17

OPINION AND
JUDGMENT ENTRY

Appeal from Crawford County Common Pleas Court
Trial Court No. 24-CR-0190

Judgment Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Decision: April 13, 2026

APPEARANCES:

    *William T. Cramer* for Appellant

    *Ryan Hoovler* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Jeremy Long ("Long"), appeals the judgment of conviction and sentence entered against him in the Crawford County Court of Common Pleas, following a jury trial in which Long was found guilty on 8 counts of an indictment charging various sex offenses against minor victims. For the reasons set forth below, we affirm in part and reverse in part.

*Procedural History*

{¶2} This case originated on July 16, 2024, when a Crawford County grand jury returned a 9-count indictment against Long, charging him as follows: Count 1 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(a); Count 2 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 3 – Rape – a first-degree felony in violation of R.C. 2907.02(A)(1)(a); Count 4 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(a); Count 5 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 6 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 7 – Rape, a first-degree felony in violation of R.C. 2907.02(A)(1)(b); Count 8 – Gross Sexual Imposition, a third-degree felony in violation of R.C. 2907.05(A)(4); and Count 9 – Gross Sexual Imposition, a third-degree felony in violation of R.C. 2907.05(A)(4).

{¶3} On July 22, 2024, an arraignment was held and Long entered a plea of not guilty to all counts of the indictment.

{¶4} On August 1, 2024, the trial court granted a prosecution motion to amend Counts 6 and 7 of the indictment, in order to specify that the alleged victim in those counts was eight years old at the times in question, not five years old as set forth in the original indictment. On April 22, 2025, the trial court granted a prosecution motion to amend all counts of the indictment to slightly modify the dates of the alleged offenses and to include a "course of conduct" allegation in Count 5 relating to venue.

{¶5} On June 4, 2025, the date upon which a jury trial began in the case, the State of Ohio filed a motion to amend Counts 1, 3, and 4 of the indictment from charges of Rape in violation of R.C. 2907.02(A)(1)(a), as originally indicted, to charges of Rape in violation of R.C. 2907.02(A)(2). After hearing arguments from counsel, the trial court granted the state's motion, over the objection of the defense. On June 5, 2025, the trial court journalized its decision on that motion to amend the indictment.

{¶6} As noted, a jury trial commenced in the case on June 4, 2025. During the course of the three-day trial, the prosecution presented the testimony of six witnesses and fifteen evidentiary exhibits. Just prior to resting its case, the state moved to dismiss Count 4 of the indictment, based on the lack of evidence presented to support the charge in Count 4. The trial court granted that motion and ordered that Count 4 be dismissed. The trial court further ordered that Counts 5, 6, 7, 8, and 9 be renumbered as Counts 4, 5, 6, 7, and 8.

{¶7} After the State of Ohio rested its case, Long moved for acquittal pursuant to Crim.R. 29, and that motion was overruled by the trial court. Long then presented the testimony of five witnesses and four evidentiary exhibits.

{¶8} Following the closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation in the afternoon of June 6, 2025. Later that same date, the jury returned verdicts finding Long guilty as charged in the remaining eight counts of the amended indictment. The trial court accepted the verdicts after polling the jury.

{¶9} On June 12, 2025, a sentencing hearing was held and Long was sentenced as follows: Count 1 – 10 years in prison; Count 2 – 10 years to life in prison; Count 3 – 10 years in prison; Count 4 – 10 years to life in prison; Count 5 – 10 years in prison; Count 6 – 10 years to life in prison; Count 7 – 60 months in prison; and Count 8 – 60 months in prison. The trial court ordered that Counts 1 and 2 be served concurrently, but consecutively to all other counts; that Counts 3 and 4 be served concurrently, but consecutively to all other counts; that Counts 5 and 6 be served concurrently, but consecutively to all other counts; and that Counts 7 and 8 be served concurrently, but consecutively to all other counts. Later that same date, the trial court journalized its sentencing orders.

{¶10} On July 2, 2025, Long filed the instant appeal.

*Summary of Evidence Presented at Trial*

**{¶11}** The State of Ohio's first witness at trial was Kayla Bibb, formerly known as Kayla Long. Kayla, who was 37 years old at the time of trial, testified that she met Long in 2006, they were married on June 1, 2013, and then divorced in August of 2024. In her testimony, Kayla described the residences and locations at which she and Long had lived during the course of their relationship, for the various time periods relevant to the charges in the indictment. Those homes included an apartment at the Crestwood Villa Apartments in Crestline, Ohio, where they lived for about two years, from 2013 to 2015; an apartment on North Union Street in Galion, Ohio, which was near a Wendy's restaurant, where they lived for two or three months after moving from the Crestwood Villa Apartments; an apartment on South Market Street in Galion, Ohio, which was near a drive-thru, where they lived for approximately one year after moving from the apartment near the Wendy's; a trailer on North Street in Crestline, Ohio, which they moved into in approximately May of 2017 and lived in for less than a year; and an apartment at the Galion East Apartments on Harding Road East in Galion, Ohio. Kayla also identified photographs of the exteriors of those residences and described the interior layouts.

**{¶12}** Kayla testified that Long has a brother named Ronnie Long and a deceased sister, Kimberly. Kimberly was the mother of two children, a son, "J.A.", and a daughter, "S.A.", both of whom had visited Kayla and Long in their home, including several overnight visits. Kayla testified that she specifically recalled S.A.

coming to visit during an Oktoberfest festival held near their apartment in Galion. Kayla also testified that Long had a close relationship with S.A., who was about eight years old at the times she had come over for visits. Kayla testified that Long would wrestle around with S.A., as well as playing video games and board games with her. Kayla testified that, on one occasion, she felt the manner in which Long was playing with S.A. was inappropriate, because he was holding her with her legs wrapped around his hips. Kayla testified that she mentioned that to Long at the time, because it seemed inappropriate, but Long said he was just playing around with his niece.

{¶13} Kayla further testified that Long was friends with a couple, Phillip and Jennifer, who have three daughters, "K.C", "E.C", and "R.J". Two of those girls, K.C. and E.C., had visited Kayla and Long in their home, including numerous overnight visits. Kayla testified that, during those visits, Long would wrestle around on the floor with the girls and put their legs around his hips. Kayla further testified that, while the two girls liked coming over to visit, the visits subsequently stopped abruptly.

{¶14} Kayla testified that Long has two biological children, including a son, "E.M.". When Kayla first met Long, he was not in contact with E.M. but, subsequently, E.M.'s mother reached out to Long about his son, and Long and Kayla then began going over to the mother's house so that Long could get to know E.M. After several such visits with E.M., he came for an overnight visit at the residence

of Long and Kayla. Kayla testified that, on that occasion, she and Long picked up E.M., took him to their home for a while, and then the three of them went to McDonald's and the reservoir. Kayla recalled that, once back at their residence, Long was wrestling with E.M., after which E.M. went into the bedroom and Long followed him. Kayla testified that E.M. told them he wanted to go home because he did not have a television or air conditioning in his room.

{¶15} Finally, Kayla testified on direct examination that Long normally wore red Ohio State pajama pants and a white t-shirt when he was at home, and that he typically did not wear underwear under the pajama pants.

{¶16} On cross-examination, Kayla testified that while she and Long divorced in 2024, they separated in September of 2018, at which time she had left Long and taken most of their belongings with her. Kayla confirmed that, during the years she lived with Long, she observed questionable conduct on his part but she never reported any improper conduct to anyone, including the police. Kayla also testified that, during the time she lived with Long, none of the children who visited them had ever told her they were having trouble with Long. Kayla testified that she could not recall at what point in time K.C. and E.C. had stopped visiting the Longs, nor could she recall at what point in time S.A. quit coming over. Kayla confirmed that, back at the point when S.A. had been visiting with the Longs, S.A.'s homelife and family situation were very chaotic, and that both of S.A.'s parents subsequently died due to their substance abuse issues. Finally, Kayla testified on cross-

examination that she had more recently had occasional contact with K.C. via Facebook Messenger but that the two of them had not communicated about the case against Long.

{¶17} The State of Ohio's second witness at trial was E.C., who was born in August of 2001, making her 23 years old at the time of trial. E.C. testified that she has one sister, K.C., as well as several step-siblings. E.C. testified that she knows Long because her father, Phillip, had been friends with Long. E.C. recalled that her father and Long used to spend a lot of time together and that, while Long was not initially married, he then married Kayla, whom E.C. viewed as an aunt. E.C. testified that she and her sisters, K.C. and R.J., would go and stay with Long and Kayla, during which visits they would play games, and cook, and sometimes visit parks. E.C. testified that Long and Kayla lived in three or four different homes during the timeframe of those visits, including an apartment at the Crestwood Villa Apartments in Crestline, an apartment near a Wendy's, and an apartment near a drive-thru in Galion. E.C. identified photos of those apartments, which were the same photos identified previously by Kayla Bibb as being some of the locations where she and Long had lived.

{¶18} E.C. testified that the first place she recalled spending time with the Longs was the Crestwood Villa apartment, which was a one-level apartment located on the second floor of the building. E.C. estimated that she was 14 or 15 years old when she was visiting there, and she testified that Long would play games on the

computer while she was there and he did not interact much with E.C., and he did nothing during the visits at that apartment that made her feel uneasy. E.C. testified that the Longs then moved to an apartment near a Wendy's but that she did not spend the night at that apartment.

{¶19} E.C. testified that the Longs next lived in an apartment by a drive-thru in Galion, where she did spend the night several times with her sisters, at which time she was almost 15 years of age. E.C. testified that their visits at that apartment were typically on weekends and that, during one of those visits, something happened involving Long. E.C. testified that, on the date that something happened, she was playing Monopoly with her sisters in the dining room but that she lost and was out of the game, so she got up to watch television in the living room. E.C. testified that, when she went into the living room, Long picked her up and carried her, over his shoulder, to a bedroom upstairs. E.C. testified that, once in the bedroom, Long threw her on the bed, moved his pants around, and began removing E.C.'s clothing. E.C. testified that she tried to stop him by moving around and telling him no, but that she was unsuccessful because he was a grown man. E.C. testified that Long held both of her wrists over her head with one of his hands while using his other hand to partially pull down her pants and underwear, and that he held down her legs with his legs. E.C. testified that Long, who was wearing a pair of Ohio State pajama pants but no shirt, was on top of her on the bed. E.C. testified that Long then exposed his penis, which she believed to have been erect, and thrust it into her

vaginal area. E.C. testified that Long's penis did not go all the way into her vagina but, rather, his penis pushed up against her in the area of her clitoris. E.C. testified that the feeling of that on her body was uncomfortable and that she tried to move out of his way but was not able to due to him overpowering her. E.C. testified that she wanted to scream but that nothing came out when she tried. E.C. testified that the incident lasted five to ten minutes and ended when Long appeared to ejaculate onto the bed, which he then began wiping up. E.C. testified that, afterwards, she tried not to cry because she did not want the others downstairs to know anything had happened, due to her thinking it was her fault. E.C. testified that she only visited the Longs once or twice following that incident.

{¶20} E.C. testified that she did not disclose what happened until much later, when she was speaking with her mother on the phone and the topic of sexual abuse came up and E.C. then felt safe enough to tell her mother what had happened. Upon telling her mother about the incident, her mother called the police. E.C. was then interviewed, along with her sister K.C., by the Crestline Police Department and a woman from Child Protective Services, as K.C. had also disclosed that something had happened. A couple days after that, E.C. was interviewed by the Galion Police Department. E.C. acknowledged in her testimony that she had initially told the officers from those police departments that the incident involving Long occurred in the apartment near the Wendy's, but that she later realized she had mixed up the apartments.

{¶21} On cross-examination, E.C. testified that it was May of 2017 when she reported the incident involving Long, and that the incident had happened approximately one year prior to that time. E.C. confirmed that, when first interviewed by police, she stated that she was there because her mother believed E.C.'s brother had sexually assaulted her, and she explained that the Crestline police were pushing her to say her brother had done it. E.C. testified that nothing had ever happened between her and her brother, but that her mother seemed to have a vendetta against the brother. E.C. confirmed in her testimony that Long's wife, Kayla, had been present at the apartment when the incident occurred, along with E.C.'s two sisters. E.C. testified that she had not reported the assault sooner because her brain was telling her it was her fault. E.C. confirmed that, at the time the incident occurred, she was a freshman in high school and weighed about 200 pounds. When asked about Long's ability to carry her up the stairs, E.C. testified that she does not know how he did it, but that is what happened.

{¶22} At trial, the State of Ohio's third witness was K.C., who was born in August of 2003. K.C. testified that she grew up in Crestline, Ohio, and that she has a sister, E.C., and the two sisters lived together in the same household while growing up. K.C. testified that her father, Phillip, had been best friends with Long, and so K.C. had known Long since she was two or three years old. K.C. viewed Long as an uncle and his wife, Kayla, as an aunt. K.C. testified that she and E.C. often spent time with Kayla when they were younger, playing board games at Kayla's house.

K.C. testified that she first started spending the night at the Longs' home when she was 12 or 13, and that those first visits took place at the Longs' apartment at the Crestwood Villa Apartments in Crestline. K.C. testified that she and E.C. would spend the night there, staying up late to play board games. K.C. testified that Long usually played on his computer when they were there, but that he did try to wrestle with K.C., which made her uncomfortable.

{¶23} K.C. testified that, during one visit at the Crestline apartment, she and E.C. and Kayla were playing a game when Long came home. K.C. testified that Long asked where his hug was, that he hugged her, and then picked her up and carried her out of the room. K.C. testified that she was kicking and yelling for help, but that everyone thought she was joking. K.C. testified that Long carried her into the bedroom, threw her on the bed, and pinned her arms and legs down, using his arm to hold down her arms and his legs to hold down her legs. K.C. testified that Long pulled down her pants, pulled down his own Ohio State pants, and tried to insert his penis into her vagina. K.C. testified that Long thrusted four or five times, but she was too small and he could not fully penetrate her. K.C. testified that, after Long thrusted four to five times, he stopped and went into the bathroom like nothing had happened, while she remained on the bed trying to comprehend what had just occurred. K.C. testified that she felt uncomfortable and depressed, but she got up and went back out to play the game and did not tell anyone what had happened.

K.C. testified that she did not initially tell anyone what had happened because she did not know it was wrong.

{¶24} K.C. testified that the Longs subsequently moved to another apartment, which she called the "drive-thru apartment." K.C. testified that she and her sister visited the Longs at the drive-thru apartment a couple times. K.C. recalled that the apartment had an upstairs and downstairs, with white walls and light gray carpet. During the visits at that apartment, they would play games as usual, and stay up late. On one occasion while K.C. and E.C. were there visiting, Long came home from work, asked for a hug, and then picked her up and carried her upstairs. Once upstairs, he put her on the bed and held her down, while pulling down her leggings. K.C. testified that she again tried to wiggle free but he was too strong for her. K.C. testified that once Long got her leggings down, he exposed himself and then thrusted into her four or five times as he had before. K.C. testified that, as had happened before, Long was not able to fully penetrate her, and so he stopped.

{¶25} K.C. testified that, after that second offense, she ended up revealing to her mother what had happened with Long. As a result, the police became involved and interviewed both K.C. and E.C. K.C. testified that during the interview, which was conducted jointly with that of E.C., she did not want to talk about the incidents with Long and so she initially told the police the same exact things that her sister told them, including that the assaults had occurred at the apartment near the

Wendy's, which was not accurate. K.C. testified that she did not initially reveal the full details to the police because she just wanted to get the whole thing over with.

{¶26} On cross-examination, K.C. confirmed that she had revealed the incidents to her mother on May 30, 2017, and that she told the police that the incidents occurred in the same manner as with E.C., which was mostly true. K.C. testified that she told her mother about what had happened because she was uncomfortable the next time she was asked to visit the Longs, and her mother had been through sexual abuse and so K.C. finally felt comfortable speaking with her mother about it. K.C. testified that, at the time Long carried her up the stairs, she weighed less than 100 pounds.

{¶27} The fourth witness to testify for the prosecution at trial was E.M., who was born in April of 2006, and is Long's biological son. E.M. was raised by his mother and other maternal family members and was 11 years old when he first found out that Long was his father, after E.M. asked his mother about who his father was. E.M. testified that, after speaking to his mother about who his father was, his mother found Long on Facebook and made contact with him. Following that, E.M. began having some visitations with Long, which took place at the home of relatives or in a local park. At that time, E.M. also met Long's wife, Kayla. E.M. testified that his father and Kayla were living in Crestline at a trailer park at that time.

{¶28} E.M. testified that, after several visits with Long, it was arranged that E.M. would have an overnight visit with Long and Kayla at the trailer. E.M. testified

that the Longs picked him up, that they went to Burger King, and then back to the trailer. Once back at the trailer, E.M., Kayla, and Long played board games on the coffee table. E.M. testified that he was sitting on the floor next to Long, when suddenly Long started play wrestling and pinned E.M. down to the floor by his wrists. E.M. testified that Long was laying on top of him, and began kissing and sucking on the sides of E.M.'s neck. E.M. testified that he felt Long get erect, against E.M.'s lower thigh. E.M. looked over at Kayla, but she was sitting on the couch playing a game on her phone. E.M. hoped that Kayla would intervene, but she did not, so E.M. asked Long to stop because it was hurting his wrist that had recently been injured, and Long finally stopped.

{¶29} E.M. testified that he felt uncomfortable and went into the bathroom to take a shower, even though he was one of those kids who hated taking showers. E.M. testified that, while he was in the shower, Long came into the bathroom, pulled back the curtain, and looked up and down E.M.'s naked body with a smug look on his face. E.M. testified that Long then left the bathroom, and E.M. finished his shower and went into the guest bedroom where he was staying. E.M. testified that Long came into the guest room to say good night, and that Long then pinned E.M. down on the bed by both wrists and once again began kissing and sucking on his neck. E.M. testified that he again felt Long get erect, and that this went on for two to three minutes, until Long finally stopped after E.M. had both struggled and asked Long to get off of him. E.M. testified that Long left the room and E.M. played on

his phone until he fell asleep. The next day, E.M. demanded to go home, telling the Longs he was homesick and there was no TV or air conditioning in the guest room. In his testimony, E.M. confirmed that he was 11 years old at the time the incidents occurred.

{¶30} On cross-examination, E.M. confirmed that he was 11 when he learned his father's name, that they then had five or six visits before the Longs picked him up the one time to take him to their home for the visit there. E.M. testified that he thought he and Long got along pretty well during the visits, but that he did not like the wrestling. E.M. testified, as he had on direct examination, that it was Long who had pinned him down, not the other way around. E.M. testified that, when he got home after that visit at the trailer, he told his mother what had happened and the two of them then went to the police station to report it. E.M. confirmed that, at the time of trial, he was 19 years old. E.M. was not able to identify his father in the courtroom, as he had not seen him since he was 11 years old.

{¶31} The fifth witness for the State of Ohio at trial was S.A., who was born in June of 2008. S.A.'s deceased mother, Kimberly, who died in 2021, was Long's sister. S.A. testified that, at the time of trial, she had just finished her junior year of high school, taking mostly college courses, and would graduate the following year with an associate's degree. S.A. testified that her early childhood was traumatic for several reasons, including the fact that her mother and her mother's husband, whom S.A. believed to be her father but was not, both struggled with substance addictions.

{¶32} S.A. testified that, throughout her childhood, there were several family members with whom she would spend time on weekends, including Long and his wife, Kayla, once they were married. S.A. testified that, when she was young, Long would also come over and spend time with S.A.'s mom at the home where they lived.

{¶33} S.A. testified that on one of those occasions, when she was approximately five years old, Long was visiting at the residence where S.A. lived. During that visit, S.A. was downstairs in the basement by herself, playing with her toys. S.A. testified that, while she was in the basement, Long came downstairs, approached her, and pulled down her pants and underwear. S.A. testified that Long began touching her inappropriately, rubbing her vagina, and that lasted for several minutes. S.A. testified that she felt very uncomfortable and did not understand what was happening. As a result, she did not then tell anyone what had occurred.

{¶34} S.A. testified that, a couple of years later, when she was six or seven years old, she began spending time with Long and Kayla at their apartment near a Wendy's. One visit to that apartment was when S.A. was eight or nine years old, during Oktoberfest, when S.A. and her brother, J.A., went over to visit the Longs and attend the festival. After going to the festival, J.A. went home but S.A. stayed on at the Longs' apartment, where she recalled sitting on the couch and watching a movie. S.A. testified that Kayla left the room for some reason, at which point Long walked over to S.A., pulled down her pants and underwear, and began licking her

vagina. S.A. testified that she recalled feeling very uncomfortable and told Long to stop, but he reached up and put his hand over her mouth, and then continued licking her vagina. After he stopped doing that, he said nothing and left S.A. on the couch. S.A. testified that she again told no one at that time what had happened, because she was young and scared, and Long was a trusted adult.

{¶35} S.A. testified that, subsequently, Long and Kayla moved to another apartment, near a drive-thru in Galion. S.A. testified that, when she was nine years old, she was visiting the Longs at that apartment, and they were playing games as they often did. S.A. wanted to play Bingo, but the Bingo game was upstairs. S.A. testified that Long led her upstairs, got the Bingo game out of the closet, then took her into the bedroom and instructed her to give him oral sex. S.A. testified that, specifically, Long pulled down his Ohio State pajama bottoms, and told her to kiss and lick his penis, which was erect. S.A. testified that, in response, she did as he instructed, putting her mouth on his penis and licking and kissing it. S.A. testified that went on for a few minutes, but was interrupted by the sounds of someone coming into the house, at which point Long quickly got up and left the room. S.A. testified that she then walked back downstairs and that, while she could have told Kayla what happened, she was in fear of doing so.

{¶36} S.A. testified that she eventually told her mother what had happened and, while her mother did not think it was necessary to do anything about the situation, S.A.'s contact with the Longs was limited after that. S.A. testified that

she did not report Long's conduct to law enforcement until October of 2023, following a suicide attempt on S.A.'s part. After overdosing on pain pills, S.A. was taken to Nationwide Children's Hospital, and she then confided in her guardians about what Long had done years before. S.A. was subsequently interviewed by law enforcement personnel.

{¶37} On cross-examination, S.A. testified that, as a result of intervention from Children's Services, she stopped living with her mother around 2020 and that she would sometimes spend weekends with her maternal grandmother, Naomi Nolan. S.A. testified that she never told her grandmother about what Long had done. When questioned about the multiple police interviews she had participated in, S.A. acknowledged that there were minor inconsistencies in some of the details that were reported about the incidents involving Long. When asked why she waited so long to disclose the alleged abuse by Long, S.A. testified that she felt fear, guilt, and shame, which were the same emotions that led her to attempt suicide.

{¶38} The State of Ohio's sixth and final witness at trial was Brandon Grant, a detective with the Galion Police Department. Grant testified that he began investigating Long following S.A.'s disclosures in October of 2023. During that investigation, Grant discovered that other law enforcement agencies had opened investigations as a result of the allegations made by E.C., K.C., and E.M. Detective Grant testified that in November of 2023, he interviewed Long, who denied S.A.'s allegations. However, Grant testified that Long acted in a very unusual manner

during that interview in the police department interview room. Grant testified that Long brought his own cup to the interview, and would not touch the door knobs or doors with his hands but, instead, used his coat. Detective Grant testified that Long also would not shake hands with detectives, when a hand was extended for a handshake.

{¶39} Detective Grant also testified as to other aspects of the investigation, such as interviewing Kayla Long and obtaining verification of the residences in which she and Long had lived, and during what timeframes. Grant also interviewed E.C. and K.C.

{¶40} On cross-examination, Detective Grant acknowledged that interviewing E.C. and K.C. together at the same time may have not been the best practice.

{¶41} After the State of Ohio rested its case, the defense called Long's mother, Naomi Nolan, as its first witness. Nolan testified that she owned a trailer that Long lived in before he married Kayla, and that he had moved out of the trailer in 2012. Nolan further testified that S.A. is her granddaughter, and Nolan briefly had custody of S.A. on a couple occasions, due to S.A.'s parents having a hard time with alcohol and drugs. Nolan testified that S.A. never mentioned any sexual abuse to her, and Nolan never suspected anything like that was happening.

{¶42} Long then testified on his own behalf. Long testified that he was born in December of 1977, making him 47 years old at the time of trial. Long testified

that he had heard all of the testimony of the four alleged victims, that none of it was true, and that he denied everything. Long testified that E.C. and K.C. had never been to the apartment he and Kayla lived in near Wendy's, and he testified that S.A. had been there during Oktoberfest but was never inside. Long testified that he was not a weight lifter and that he would not be able to carry 200 pounds up a flight of stairs on his shoulder. Long testified that, when the girls would visit he and Kayla, he would play board games or card games with them, but never engaged in any horseplay and never picked them up. As to E.M.'s allegations, Long testified that it was true that E.M.'s mother reached out to him on Facebook and that he subsequently began visiting with the child. Long testified that E.M. visited with them at the trailer once or twice, but did not want to come back because there was no television or air conditioner in his room. Long further testified that, on one occasion, he took E.M. to Long's mother's home, in order for her to meet E.M., and that E.M. stated he was going to get Long in trouble if he did not take E.M. to Cedar Point. Long also testified that E.M.'s mother, Grace, had asked Long to visit her without bringing Kayla along, and that Long had done so three times. Long testified that, during the first of those visits, he was talking to E.M. about wrestling and then E.M. got on top of Long and pinned him down across his waist. Long testified that Grace then straddled him over his head, while wearing a black dress, and then E.M. pointed out that Long had an erection. With regard to the shower incident, Long testified that he merely smelled E.M.'s hair after he got out of the shower, to confirm

E.M. had washed his hair. Long then testified about the number of part-time, seasonal jobs he had held over the course of his life. Long testified that he and Kayla had been married on June 1, 2013, and that she ultimately left him in September of 2018, when she moved out with no notice. Long testified that he attempted to reconcile with Kayla for about a year and a half, but that she was not receptive and got a restraining order. Finally, Long testified that, with the exception of traffic offenses, he had no prior convictions.

{¶43} The third defense witness called at trial was Jamey Gregory, who is the investigator for the Crawford County Prosecutor's Office. Gregory testified that, in doing follow-up investigation for the prosecutor's office, he opted to not speak to Long's mother and stepfather because he assumed they would take Long's side. Gregory also acknowledged that he avoided certain questions when interviewing Long's brother. Gregory testified that he does not pursue investigating tasks that do not seem helpful to the case but denied targeting Long in the investigation.

{¶44} On cross-examination, Gregory testified that he followed the course of investigation discussed with the prosecutors on the case, and that he cut short his interview with Long's brother because the brother seemed to have no firsthand knowledge of the crimes at issue. Gregory testified that, based on what Long's brother had told him, he did not follow up with Long's mother and stepfather.

Gregory also confirmed that he was not involved in the police investigation of the case against Long.

{¶45} The fourth defense witness called at trial was Ronnie Long, who is Long's younger brother. Ronnie Long testified that he had told the investigator for the prosecutor's office that he did not think his brother was capable of doing such things. Ronnie Long testified that he had no past interactions with the family of E.C. and K.C., although he used to see S.A. occasionally. Ronnie Long testified that he never observed any child abuse.

{¶46} On cross-examination, Ronnie Long acknowledged that his brother was the "fun uncle" who spent lots of time with kids.

{¶47} The fifth and final defense witness called at trial was Daniel Nolan, Long's stepfather. Nolan testified that he had been married to Long's mother since 2007, and that he had no knowledge of Long having problems as alleged.

*Assignments of Error Raised on Appeal*

**First Assignment of Error**

**Long's constitutional right to indictment by grand jury was violated by an amendment at the start of trial to counts one and three that changed the identity of the offenses.**

**Second Assignment of Error**

**Appellant's convictions were not supported by the weight of the evidence.**

*Analysis of Assignments of Error*

*First Assignment of Error*

**{¶48}** In the first assignment of error, Long asserts that the trial court erred in permitting the State of Ohio to amend Counts 1 and 3 of the indictment just prior to trial.

**{¶49}** With regard to this issue, the record reflects that on June 4, 2025, the date that the jury trial began in the case, the State of Ohio filed a motion to amend Counts 1, 3, and 4 of the indictment from charges of Rape in violation of R.C. 2907.02(A)(1)(a), as originally indicted, to charges of Rape in violation of R.C. 2907.02(A)(2). On that same date, after a jury had been seated but before opening statements were made in the case, the trial court addressed the state's motion to amend the indictment on the record, outside the presence of the jury. At that time, over a general objection lodged by the defense, the trial court granted the state's motion to amend, a decision that was journalized by the trial court on June 5, 2025.

**{¶50}** On appeal, Long argues that the trial court committed reversible error in permitting that amendment to the indictment, as to Counts 1 and 3.[1] Specifically, Long asserts that the amendment to Counts 1 and 3 granted by the trial court served to change the identity of the crime at issue in each of those two counts, in violation of Crim.R. 7 and in violation of Long's constitutional rights. Following our review

_____

[1]Pursuant to the trial court's ruling on the state's motion, Count 4 of the indictment was also amended in the same fashion as Counts 1 and 3. However, the prosecution subsequently dismissed Count 4 during the trial, and therefore the amendment to Count 4 is not at issue on appeal.

of the record, and upon applying the relevant legal principles, we find that Long's

contention has merit.

{¶51} As explained by the Supreme Court of Ohio in *State v. Troisi*, 2022-

Ohio-3582:

> Under Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution, a person accused of a felony is entitled to an indictment setting forth the "nature and cause of the accusation." This serves two purposes. First, "[b]y compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to defend." *State v. Sellards*, 17 Ohio St.3d 169, 170, 17 Ohio B. 410, 478 N.E.2d 781 (1985). Second, "[a]n indictment, by identifying and defining the offense, also enables an accused to protect himself from any future prosecutions for the same offense." *Id*.

*Troisi*, at ¶ 21.

> Crim.R. 7(D) provides, in relevant part:

> The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. * * *

{¶52} "Under Crim.R. 7(D), a change in the name or identity of the charged

crime occurs when an indictment is amended so that the offense alleged in the

original indictment and the offense alleged in the amended indictment contain

different elements requiring independent proof." *State v. Dukes*, 2003-Ohio-2386, ¶

10 (3d Dist.). "'A trial court commits reversible error when it permits an amendment

that changes the name or identity of the offense charged, regardless of whether the

defendant suffered prejudice.'" *State v. Abdullah*, 2007-Ohio-7010, ¶ 8 (10th Dist.), quoting *State v. Kittle*, 2005-Ohio-3198, ¶ 12 (4th Dist.), appeal not allowed, 2005 Ohio 5859.

{¶53} "Whether an amendment changes the name or identity of the crime charged is a matter of law and must be given a de novo review on appeal." *State v. Cook*, 2019-Ohio-3610, ¶ 8 (3d Dist.), citing *State v. Kittle*, *supra*.

{¶54} In the instant case, Counts 1 and 3 of the original indictment charged Long with separate incidents of Rape in violation R.C. 2907.02(A)(1)(a), which provides that "[n]o person shall engage in sexual conduct with another when * * * [f]or the purpose of preventing resistance, the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception."

{¶55} Pursuant to the amendment of the indictment, Counts 1 and 3 were amended to charges of Rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶56} It is undisputed that the name of the crimes charged in Counts 1 and 3 was never amended – Long was charged with Rape in those counts in both the original indictment and the amended indictment. However, Long was on notice from the initial indictment that he was charged in Counts 1 and 3, pursuant to R.C.

2907.02(A)(1)(a), with raping someone by way of substantially impairing that person's judgment or control by surreptitiously, or by force, threat of force, or deception, administering any drug, intoxicant, or controlled substance to the other person for the purpose of preventing resistance. The amendment of Counts 1 and 3 of the indictment served to eliminate those factual allegations and, instead, charged Long in those two counts with raping someone by way of purposely compelling the other person to submit to sexual conduct by force or threat of force, pursuant to R.C. 2907.02(A)(2).

{¶57} Upon a comparison of the elements of the two forms of Rape at issue here, we conclude that the offenses alleged in Counts 1 and 3 of the original indictment and the offenses alleged in Counts 1 and 3 of the amended indictment contain different elements that require independent proof. While the State of Ohio argues that both the original indictment and the amended indictment alleged in Counts 1 and 3 that force or threat of force was involved in the commission of the rapes at issue, and therefore no change in the identity of the charged crimes occurred, we find there to be a material factual distinction between administering a drug or intoxicant by force or threat of force in order to lower resistance and a situation where one purposely compels a person to submit to sexual conduct by force or threat of force.

{¶58} Accordingly, by adding the forcible rape language to the indictment by way of the amendment, the amendment of Counts 1 and 3 served to

impermissibly change the identity of the crimes charged in those two counts. As reflected by the legal authority cited above, the issue is not whether Long was prejudiced by the amendment. When the identity of a crime is changed, it does not matter if the defendant can show prejudice; the purpose of the rule is to avoid the potential of prosecutorial abuse. *State v. Dilley*, 47 Ohio St.3d 20, 22-23 (1989).

{¶59} As Long had the right to be tried on the same essential facts upon which the grand jury found probable cause, the trial court erred in granting the prosecution's motion to amend Counts 1 and 3 of the indictment. Under these circumstances, Long's convictions on Counts 1 and 3 must be reversed.

{¶60} The first assignment of error is sustained.

*Second Assignment of Error*

{¶61} In the second assignment of error, Long argues that his convictions on all eight counts of the amended indictment were against the weight of the evidence.

{¶62} When determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge,

a reviewing court must still allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

**{¶63}** In the instant case, as a preliminary matter, we note that our disposition of the first assignment of error, *supra*, renders moot the arguments made by Long in the second assignment of error as to Counts 1 and 3. Therefore, we need not analyze the weight of the evidence with regard to those two counts. App.R. 12(A)(1)(c).

**{¶64}** With regard to the remaining six counts upon which Long was convicted and sentenced, the record reflects the following.

**{¶65}** In Count 2, relating to victim K.C., Long was found guilty of Rape in violation of R.C. 2907.02(A)(1)(b). In Count 4 (renumbered from Count 5 of the original indictment, due to the dismissal of the original Count 4), in Count 5 (Count 6 of the original indictment), and in Count 6 (Count 7 of the original indictment), all relating to victim S.A., Long was also found guilty of Rape in violation of R.C. 2907.02(A)(1)(b).

{¶66} In Count 7 (Count 8 of the original indictment), and in Count 8 (Count 9 of the original indictment), both relating to victim E.M., Long was found guilty of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4).

{¶67} Thus, at issue in Count 2 and at issue in Counts 4, 5, and 6 as renumbered was the crime of Rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Pursuant to R.C. 2907.01(A), "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." Additionally, "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id*.

{¶68} In renumbered Counts 7 and 8, at issue was the crime of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), which provides that "[n]o person shall have sexual contact with another; cause another to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." Pursuant to R.C. 2907.01(B), "sexual contact" means "any touching of an erogenous zone of another,

including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶69}** On appeal, Long does not dispute that sufficient evidence of the requisite elements of all six counts at issue was introduced at trial, and our thorough review of the evidence presented supports that concession. However, Long argues in the second assignment of error that his convictions on the six counts at issue are against the manifest weight of the evidence because the victims were not credible.

**{¶70}** In support of that argument as to Count 2, involving K.C., Long argues that K.C.'s testimony was not plausible on its face, primarily because she initially followed her sister's lead when speaking with police investigators, and K.C. indicated when first interviewed that the rape at issue had occurred at a different apartment. However, K.C. addressed and clarified those issues in her trial testimony. Moreover, the jury was able to see, hear, and evaluate K.C.'s testimony and was free to believe or disbelieve any or all of that testimony. *State v. Williams*, 2024-Ohio-2307, ¶ 27 (3d Dist.), citing *State v. Shockey*, 2024-Ohio-296, ¶ 24 (3d Dist.).

**{¶71}** As to Counts 4, 5, and 6 (as renumbered), involving S.A., Long asserts that S.A.'s delayed disclosure of the sexual assaults ruined her credibility. However, S.A. provided a reasonable explanation at trial as to why she did not disclose the crimes until many years after they occurred. Further, as this Court noted

in *State v. Lewis*, 2020-Ohio-6894 (3d Dist.), "courts across this state have concluded that a delay in reporting allegations of sexual abuse does not necessarily indicate that a conviction for the related offenses is against the manifest weight of the evidence." *Id.* at ¶ 55, citing *State v. Bones*, 2015-Ohio-784, ¶ 33-34 (2d Dist.); *State v. Lykins*, 2019-Ohio-3316, ¶ 50 (4th Dist.); *State v. Weaver*, 2019-Ohio-2715, ¶ 8 (7th Dist.); *State v. Mathis*, 2004-Ohio-2982, ¶¶ 25, 27 (8th Dist.).

{¶72} As to Counts 7 and 8 (as renumbered), involving E.M., Long suggests that E.M.'s testimony was not plausible, particularly as to the first incident, because Long's wife was present at the time Long began kissing and sucking on E.M.'s neck while wrestling with him on the floor. With regard to that argument, we note that, had E.M. manufactured his testimony, he could have easily also claimed that the incident happened when Kayla was not present, in order to make the story more believable. More importantly, Kayla's own testimony corroborated the fact that Long tended to "wrestle" with children in their home in a manner that struck her as inappropriate. Kayla also confirmed that, during the years she lived with Long, she observed questionable conduct on his part even though she never reported any such conduct.

{¶73} Finally, as to all six counts at issue, while Long testified at trial that the events testified to by the victims never happened, "[a] verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's

witnesses rather than the defendant's version of the events." *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.).

**{¶74}** In summary, following this Court's independent review of the record and weighing of the evidence and all reasonable inferences therefrom, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction, nor is there any indication that the jury lost its way in finding Long guilty of the six counts at issue.

**{¶75}** The second assignment of error is overruled.

*Conclusion*

**{¶76}** Having found error prejudicial to the defendant-appellant as assigned and argued in the first assignment of error, the judgment of conviction and sentence entered in the Crawford County Court of Common Pleas as to Counts 1 and 3 is reversed. Having found no error prejudicial to the defendant-appellant as assigned and argued in the second assignment of error, the judgment of conviction and sentence entered in the trial court as to the remaining counts of the indictment is affirmed. The case is remanded for further proceedings consistent with this opinion.

***Judgment affirmed in part, reversed in part, and cause remanded***

**MILLER and WILLAMOWSKI, J.J., concur.**

Case No. 3-25-17

# **<u>JUDGMENT ENTRY</u>**

For the reasons stated in the opinion of this Court, it is the judgment and order of this Court that the judgment of the trial court is affirmed in part and reversed in part with costs assessed equally between Appellant and Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

Juergen A. Waldick, Judge

Mark C. Miller, Judge

John R. Willamowski, Judge

DATED:
/jlm

-34-